# United States Court of Appeals for the Federal Circuit

---

**AGILITY DEFENSE & GOVERNMENT SERVICES, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-1068

---

Appeal from the United States Court of Federal Claims in Nos. 1:13-cv-00055-TCW, 1:13-cv-00097-TCW, Judge Thomas C. Wheeler.

---

Decided: February 6, 2017

---

WALTER BRAD ENGLISH, Maynard, Cooper & Gale, P.C., Huntsville, AL, argued for plaintiff-appellant. Also represented by EMILY J. CHANCEY, JON DAVIDSON LEVIN, JOHN ANDREW WATSON, III.

MICHAEL DUANE AUSTIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., KENNETH M. DINTZER.

---

Before MOORE, WALLACH, and TARANTO, *Circuit Judges.*

MOORE, *Circuit Judge.*

Agility Defense ("Agility") appeals from the Court of Federal Claims ("Claims Court")'s denial of its claim for an equitable adjustment arising out of its fixed price indefinite delivery contract with the Defense Logistics Agency ("DLA")'s Defense Reutilization and Marketing Service ("DRMS"). For the reasons discussed below, we reverse and remand.

## BACKGROUND

DLA is an agency of the United States Department of Defense that provides supplies for the military. DRMS is a primary level field activity of DLA that disposes of surplus military property at Defense Reutilization and Marketing Offices ("DRMOs") after the military departs an area of operations. Property that cannot be reutilized is demilitarized and/or reduced to scrap. Property reduced to scrap can be sold on the market.

Historically, the government operated all DRMOs, but in 2006, DLA's Director determined that DRMS could not sustain its workload unless it brought in outside contractors. DRMS issued a Request for Proposal ("RFP") in January 2007. The RFP sought performance of DRMO activities for up to five years. Three offerors responded to DRMS's RFP.

During solicitation, DRMS issued several amendments relevant to anticipated workload and costs. In Amendment 002 on February 26, 2007, in response to a request for "workload history and projection by category and location," DRMS stated: "Workload history and current inventory levels can be found at http://www.drms.dla.mil/newproc/index.html and link to 'DRMS Information for Southwest/Central Asia.' Additional workload data will be provided via amendment.

The Government does not have workload projections." J.A. 810. The referenced website showed DRMS's historical workload by line item and scrap weight. Line items are the number of military property items received at each DRMO for processing. Scrap weight is the amount of scrap processed at each DRMO. DRMS updated its website approximately biweekly to reflect the line items received, scrap weight, and scrap sales during the prior weeks.

In Amendment 004 on June 20, 2007, DRMS responded to a request for an estimate on workload, stating this time, "[w]e anticipate an increase in property turn-ins." J.A. 945. Amendment 004 added clause H.19, titled "DRMO Workload Changes," which contemplated that "the contractor may experience significant workload increases or decreases" and outlined a process for the contractor to "renegotiate the price" if workload increased. J.A. 836–37. As originally drafted, to warrant a pricing adjustment under clause H.19, the contractor had to experience an increased workload 150% above the workload it experienced the previous three months. Amendment 004 also added that the contractor to whom the contract is awarded may sell any scrap, and the contractor "is entitled to all sales proceeds" from the scrap sales to "offset some of the costs incurred in performing this contract." J.A. 893–94.

On July 24, 2007, DRMS issued Amendment 007. In response to an offeror's request for an estimate of scrap sales, DRMS directed offerors to an attachment projecting scrap quantities for the duration of the contract (hereinafter, the "Amendment 007 Chart"). The Amendment 007 Chart projected a stable workload for the first two years and then "workload declines" for option years three through five, down 75%, 50%, and 30%, respectively. J.A 990–91. With Amendment 007, DRMS specified that contractors would keep their scrap proceeds "without any type of reduction in payments," asking contractors to

describe their anticipated proceeds "to demonstrate the Government received consideration for providing the scrap." J.A. 1010–11.

Agility submitted its initial proposal on August 2, 2007, reflecting a $20,342,608 offset for expected scrap revenues during the life of the contract. After receiving final proposed revisions from Agility on September 24, 2007, on November 29, 2007, DRMS awarded its first-ever contract to Agility to operate six DRMOs for one base year with four option years at a fixed price of $45,233,914.92 per year. The other two offerors proposed prices well above Agility's, at $68,394,500.47 and $71,507,029.78, respectively.

In early 2008, DRMS issued its first Task Orders, which incorporated a workload baseline dated August 4, 2007 for each DRMO (hereinafter, "the Baseline Data"). DRMS retrieved the Baseline Data from the same website it referred offerors to in Amendment 002 to view DRMS's historical workload data. The Baseline Data detailed the received line items and scrap weight during the periods July 13 to July 19 and July 20 to July 26, 2007. The first Task Order requested work at the DRMO in Arifjan, Kuwait, with a period of performance from March 3, 2008 to March 2, 2009.

Upon commencing work in Arifjan, the largest of the six DRMOs, Agility immediately fell behind. It inherited a backlog of approximately 70,000 line items, which when compared to the Baseline Data would have equated to the line items received over approximately 30 weeks. From the start of Agility's performance at Arifjan, the volume of line items received at Arifjan was also greater than Agility anticipated. Over the next several months, Agility began performance at the other five DRMOs, where it also encountered backlogs at each location other than the DRMO in Speicher, Iraq. In short, the workload from the outset was substantially higher than predicted. After

receiving a June 2008 letter from DRMS expressing its concerns, Agility stated it would increase staffing at the DRMOs "by more than 50% at no additional cost to the government." J.A. 1693.

It was around this time that Agility requested clarification from DRMS regarding when it could invoke clause H.19 to request compensation for its increased workload. The parties disputed whether clause H.19's requirement that workload must increase "by more than 150% above the average workload at the DRMO location for the preceding three (3) consecutive months," J.A. 836, permitted Agility to compare its workload to the Baseline Data or required Agility to compare its workload to what it experienced upon beginning performance. Agility explained that if it was required to carry an increased workload for several months before initiating its request for increased compensation for additional staffing, it would be overwhelmed and unable to meet DRMS's needs. DRMS expressed that Agility could only invoke clause H.19 if its workload exceeded the average work it experienced the three preceding months, and opined that Agility had not met the requirements of clause H.19. DRMS argued that clause H.19 only allowed a contractor to ask for an increase if the workload was originally low and then increased by 150%. It did not, according to DRMS, allow the contractor to ask for an increase if the workload was from the outset 150% or more higher than predicted.

After months of discussion, DRMS and Agility agreed to modify clause H.19 in March 2009. Instead of requiring the parties to react to a surge, the modification permitted a pricing adjustment if DRMS or Agility anticipated "an average monthly workload increase of scrap or line items at any DRMO location by more than 25% above the monthly average of [fiscal year 2008] scrap or line items received . . . ." J.A. 1621. As amended, clause H.19 also required Agility to maintain its current

level of staffing.  Agility never submitted a formal request for costs under either the original or amended clause H.19.

The parties terminated their contract for convenience in June 2010.  Agility thereafter requested funding for its additional costs associated with performance with the contract.  It submitted two claims for increased costs to the contracting officer, claiming DRMS provided inaccurate workload estimates during solicitation.  Agility's claims requested $4,359,071.79 covering the period before the parties modified clause H.19 and $1,602,148.67 covering the period after the parties modified clause H.19.  The contracting officer awarded Agility only $236,363.93 for its first claim and nothing for the second, determining Agility could not recover the remainder because it had not satisfied the requirements of clause H.19 and noting that Agility received an offset from its scrap sales.  Agility pursued its claims in the Claims Court.[1]

The Claims Court found that, with the exception of the DRMO in Speicher, Agility experienced workloads "much greater" than the Baseline Data during the base year of performance:

| DRMO | Annualized Baseline (received line items) | Actual Workload (received line items) | Percent of Annualized Baseline |
|------|-------------------------------------------|---------------------------------------|--------------------------------|
| Speicher | 12,768 | 9,561 | 74.9% |
| Victory | 13,992 | 21,899 | 156.5% |

---

[1]    Agility pursued three theories of recovery in the Claims Court and on appeal to this court: (1) constructive change of contract; (2) negligent estimate; and (3) breach of warranty of reasonable accuracy.  Because Agility's theories of recovery are alternative to one another, we reach only Agility's claim of negligent estimate.

| | | | |
|---|---|---|---|
| Al Asad | 14,616 | 24,392 | 166.9% |
| Anaconda | 19,994 | 71,653 | 358.4% |
| Arifjan | 109,560 | 242,401 | 221.3% |
| Bagram | 6,480 | 15,364 | 237.1% |

However, it denied Agility's claims, holding that DRMS's conduct was acceptable because it provided Agility with reasonably available historical data. The Claims Court did not reach what impact, if any, clause H.19 had on Agility's claims. It found that Agility provided "no cause-and-effect links to isolate its damages" and referenced the revenue Agility received from its scrap sales to hold the equities did not weigh in Agility's favor. J.A. 16–18. Agility timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Claims Court's conclusions of law de novo and its findings of fact for clear error. *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed. Cir. 2001). Contract interpretation is a matter of law we review de novo. *Id.*

A contractor can recover damages from the government for increased costs it incurred in performing a contract under a negligent estimate theory, which requires the contractor to show by preponderant evidence that the government's estimates were "inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made." *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992). The parties agree that DRMS's contract with Agility is a requirements contract. In a requirements contract, Federal Acquisition Regulation ("FAR") 16.503 requires DRMS to provide offerors with a realistic estimate of workload. 48 C.F.R. § 16.503. FAR 16.503(a)(1) reads:

> For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

The Claims Court rejected Agility's claim of negligent estimate, finding, "[r]ather than carelessly form[] estimates by asking DRMOs to guess their upcoming needs, DRMS provided objective, historical workload data from which the offerors could extrapolate future needs." J.A. 15–16. It noted that DRMS informed offerors that property turn-ins would increase, and found "the offerors in this case were well aware of volume variations in the processing of surplus property." J.A. 16. It cited *Medart*, where we applied FAR 16.503 to a scenario in which a contractor sought reimbursement where the government's estimated needs varied significantly from those actually required. 967 F.2d at 580. We held that the government did not negligently estimate its needs when it provided the contractor with historical data from the prior year. *Id.* at 581–82. Relying on *Medart*, the Claims Court found that DRMS "used reasonably available historical data and did not negligently estimate its needs." J.A. 17.

We hold that these findings are clearly erroneous for two primary reasons. First, the Claims Court ignored that DRMS did not only provide historical data; it also estimated its requirements via the Amendment 007 Chart. Second, the Claims Court failed to address evidence indicating that DRMS's historical data was not "the

most current information available." *See* FAR 16.503(a)(1).

First, the Amendment 007 Chart provided by DRMS is itself an estimate of projected requirements. The RFP expressly states that "[t]he scope of this contractual effort includes all tasks DRMS performs in support of the Department of Defense mission." J.A. 752. One such task requires the contractor to "receive, segregate, store and dispose of scrap material and items downgraded to scrap." J.A. 779. By "providing quantity estimates of scrap commodities" for "the purpose of assisting offerors in preparing their proposals," DRMS provided an estimate of its requirements for processing scrap. *See* J.A. 1003. The Amendment 007 Chart is also relevant to the projected amount of property turn-ins or line items. As noted by the government, because scrap is created from processing the military property, the weight of scrap would be expected to correlate with the number of line items. *See* Appellee's Br. 32 ("As an intuitive matter, if Agility processed more property than anticipated, correspondingly its [scrap] sales proceeds increased."). DRMS's contracting officer likewise testified that he knew of no way to project scrap weight without projecting the amount of property turn-ins. Thus, by projecting stable and then declining scrap weight in the Amendment 007 Chart, DRMS estimated that property turn-ins would, to some extent, remain constant and then decline. It was clear error for the Claims Court not to treat the Amendment 007 Chart as an estimate.

Second, the fact that DRMS "provided objective, historical workload data" does not end the inquiry as to whether it provided a *realistic* estimate. *See* J.A. 15–16. *Medart* does not hold, and we do not hold now, that providing an offeror with historical data is reasonable per se. *See* J.A. 14 (citing *Medart*, 967 F.2d at 582). In *Medart*, we recognized that FAR 16.503 explicitly states that the government "may obtain the estimate from

records of previous requirements." 967 F.2d at 582. But an important distinction between *Medart* and the case before us is that in *Medart*, the contractor did not present evidence that "the most current information available" to the government was something other than its historical requirements. *See* FAR 16.503(a)(1). Instead, the contractor's arguments in that case rested on information it contended the government *could have* uncovered to develop a more accurate estimate. *See Medart*, 967 F.2d at 581–82. We rejected that argument, holding the government "need not search for or create additional information" and need only use "information that was reasonably available." *Id.* at 582.

Here, unlike *Medart*, Agility presented evidence that DRMS possessed information regarding its anticipated requirements above and beyond its historical requirements. Agility presented a memorandum dated November 16, 2007, before DRMS awarded Agility its contract, indicating DRMS was aware of planned troop movement and a "surge of equipment and material that will be turned over to DRMS as units depart." J.A. 1303–04. The memorandum explicitly states the anticipated surge is "[o]ne of the key reasons the contract was contemplated" and concedes "DRMS is not staffed or equipped to handle this requirement." J.A. 1304. In fact, DRMS considered this very information in connection with its decision to award the contract to Agility. *Id.*; *see also* J.A. 1179 (evaluating the sufficiency of Agility's proposal as compared to its "projected workload").

Because DRMS anticipated increased workload, simply providing offerors with historical workload was not "the most current information available" sufficient to provide a realistic estimate under FAR 16.503. DRMS should have based its estimate on its anticipated "surge" in workload. Although DRMS informed offerors that it "anticipate[d] an increase in property turn-ins," it did so on June 20, 2007, J.A. 945, before it seemingly changed course on

July 24, 2007 with its updated estimate in the Amendment 007 Chart, projecting stable workload for two years followed by "workload declines." J.A. 980, 990–91. DRMS was not obligated to guarantee the accuracy of its estimates or perfectly forecast its requirements, and Agility ultimately bore the risk associated with any variance in workload from a realistic estimate. *See Medart*, 967 F.2d at 581. But it was clearly erroneous for the Claims Court to find that DRMS complied with the requirements of FAR 16.503 by providing historical data.

In addition to the Claims Court's clear error in finding DRMS did not provide a negligent or inadequate estimate, the Claims Court clearly erred in finding that "Agility points to no specific cause-and-effect links to isolate its damages." J.A. 16–17. The Claims Court cited no evidence and provided no reasoning in support of this finding. The government argues that Agility failed to show that it actually relied on the Amendment 007 Chart or DRMS's historical data based on the dates DRMS provided these estimates to Agility. Appellee's Br. 36. It argues the Amendment 007 Chart was provided just eight days before Agility submitted its initial proposal, and the Baseline Data was provided two days after Agility submitted its proposal. *Id.* Neither of the government's arguments are supported by the record.

As for the Amendment 007 Chart, Agility's initial proposal expressly states that Agility "used the workload data provided by the government in Amendment 007 to determine manning requirements and the amount of potential revenue from the sale of scrap." J.A. 1063. A witness for Agility testified that Agility used the Amendment 007 Chart in formulating its proposal. This is the very purpose for which DRMS provided the Amendment 007 Chart to offerors: "For the purpose of assisting offerors in preparing their proposals." J.A. 1003.

As for the Baseline Data, we note that only Agility's initial proposal was submitted before the Baseline Data; Agility submitted its final revisions on September 24, 2007, well after DRMS provided the Baseline Data on August 4, 2007. Regardless, the Baseline Data was retrieved from the same website to which DRMS directed offerors in order to view historical data during Amendment 002. DRMS provided this website on February 26, 2007, over five months before Agility submitted its initial proposal. Agility's initial proposal expressly states that "[m]anpower estimates . . . are based on the historical size of the workload at each facility." J.A. 1175. A witness for Agility testified that Agility visited DRMS's website "on a regular basis" and that it factored DRMS's historical workload data into its proposal. J.A. 127:16–23, 133:16–18. And again, this was the very purpose for which the government provided its historical data, to provide "the offerors who were going to bid on the contract a view of what was going on at the site and the most current information we had available to us . . . ." J.A. 508:2–6.

FAR 16.503 requires the government to provide a realistic estimate to offerors in requirements contracts because "presumably contractors rely on the proffered estimates in formulating their bids." *Medart*, 967 F.2d at 581. The evidence overwhelmingly shows that Agility relied on DRMS's estimates when formulating its proposal. The Claims Court found, and the parties do not dispute, that Agility experienced workloads "much greater" than the workload data DRMS provided to Agility. J.A. 8. And Agility's claim for damages seeks to recover the costs it incurred from performing in excess of DRMS's negligent estimates. It was clear error for the Claims Court to find there was no causal link between DRMS's estimates and Agility's damages.

The Claims Court declined to address whether clause H.19, which provides a mechanism for the parties to adjust the contract price if specified changes in workload

are observed, forecloses Agility's claims. J.A. 12. As an issue of contract interpretation, we hold that Agility's claim of negligent estimate is not foreclosed by clause H.19.

The government does not contend that Agility's claim for compensation arises under clause H.19. Instead, it argues clause H.19 is Agility's only means of recovery. We disagree. Under FAR 16.503, DRMS was required to provide Agility with a realistic estimate of its requirements. DRMS failed to provide a realistic estimate. We see no reason why DRMS's negligence in providing an adequate estimate during solicitation should be excused by its inclusion of a provision directed to workload changes upon performance. *See* J.A. 836. Agility's claim for relief is rooted in DRMS's violation of FAR 16.503, leading to a large disparity between pre-contract estimates and actual workloads during the performance period. Agility's claim does not involve the limited subject of H.19, namely, sufficiently large changes in workload levels that might occur between earlier and later times entirely within the performance period. On the merits of Agility's claim of negligent estimate, clause H.19 bears no relevance.

Finally, we address the effect of Agility's receipt of scrap sales on its claim for an equitable adjustment. The Claims Court explained that the contract provision permitting Agility to retain scrap sale revenue somewhat mitigated Agility's risk, stating, "if contract quantities were higher than expected, theoretically the contractor's revenue from the sale of scrap would be higher." J.A. 2. It found that, despite the increased workload, Agility realized less scrap proceeds than it had projected. Nonetheless, the Claims Court held, "[a]lthough Agility faced workloads significantly in excess of what it anticipated, Agility still received over $44 million in scrap proceeds over the 27 months of the contract. The fact that the scrap proceeds were '22.9% lower' than Agility's projections does not move the equities in Agility's favor."

J.A. 18. Under the parties' contract, however, Agility's receipt of scrap proceeds does not limit Agility's recovery.

The government argues Agility improperly seeks to recover both its costs associated with increased workload while retaining all of its proceeds from scrap sales. Appellee's Br. 32. It contends DRMS anticipated that the very reason the contractor would retain scrap proceeds was to "offset some of the costs incurred in performing the contract." *Id.* (quoting J.A. 894). It suggests that by processing more property than anticipated, Agility must have received more sales proceeds. *Id.* The government's arguments are without merit.

The parties' contract expressly contemplated that Agility would retain its scrap proceeds. DRMS's RFP stated that the contractor "is entitled to all sales proceeds" from scrap sales. J.A. 894. During solicitation, DRMS explained that the contractor would retain such scrap proceeds "'free and clear' without any type of reduction in payments." J.A. 1010–11. While DRMS stated such scrap sales were intended to "offset some of the costs incurred in performing this contract," J.A. 894, the only impact Agility's scrap proceeds were to have on the contract price was the offset Agility offered to DRMS in its proposal. Agility proposed an offset of $20,342,608 from scrap proceeds over the life of the contract, offering an offset of $5,730,312 for both the base year and first option year. The government does not dispute that Agility honored this commitment and DRMS received an offset of $11,460,624 during its two years of performance. That Agility received scrap proceeds above what it offered to DRMS does not mean Agility would recover more than it is entitled to by prevailing on its negligent estimate claim. Under the contract, Agility is entitled to its scrap proceeds above the offset it offered DRMS regardless of its workload. Moreover, as found by the Claims Court, the scrap proceeds Agility actually retained were below the amount it projected. Agility's scrap proceeds do not offset

the additional cost it incurred in performing the contract. There is nothing in the record to suggest that Agility benefited from DRMS's failure to provide a realistic estimate as required by FAR 16.503.

We thus hold that the Claims Court's findings that DRMS did not inadequately or negligently prepare its estimates and that Agility did not rely on those estimates are clearly erroneous. We hold Agility's receipt of scrap sales and the parties' agreement to clause H.19 do not preclude Agility from recovering under this claim. We reverse the Claims Court's denial of Agility's negligent estimate claim and remand for calculation of Agility's equitable adjustment.

## CONCLUSION

For the foregoing reasons, we reverse the Claims Court's denial of Agility's claim for increased costs and remand for further proceedings consistent with this opinion.

## **REVERSED AND REMANDED**

### COSTS

Costs to Agility.