DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Sheffield Barbers, LLC | ) | ASBCA No. 62367 |
| | ) | |
| Under Contract No. BRG 15-002 | ) | |

APPEARANCES FOR THE APPELLANT: H. Todd Whay, Esq.
　　　　　　　　　　　　　　　Ian A. Cronogue, Esq.
　　　　　　　　　　　　　　　　Baker, Cronogue, Tolle & Werfel, LLP
　　　　　　　　　　　　　　　　McLean, VA

APPEARANCES FOR THE GOVERNMENT: Dana J. Chase, Esq.
　　　　　　　　　　　　　　　　　Army Chief Trial Attorney
　　　　　　　　　　　　　　　　MAJ Joshua B. Fix, JA
　　　　　　　　　　　　　　　　CPT Camille J. Grathwohl, JA
　　　　　　　　　　　　　　　　　Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE HERZFELD

The Army & Air Force Exchange Service (AAFES) asserts that Sheffield Barbers, LLC (Sheffield), needed to take a haircut in the fees it could charge to perform fade haircuts at Fort Bragg in North Carolina. AAFES has moved for summary judgment, asserting that the contract defined fade haircuts as regular haircuts, not the more expensive style haircuts. We deny AAFES's summary judgment motion as to Sheffield's breach and constructive change allegations because the agency waived its preferred interpretation by failing to enforce this contract provision over an extended period. We grant AAFES's summary judgment motion as to Sheffield's allegations of unreasonable estimates.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

On January 21, 2015, AAFES solicited offers to operate barber shops at Fort Bragg in North Carolina (R4, tab 8). On February 10, 2015, AAFES awarded Sheffield a concessionaire contract (the Contract) (R4, tab 1). In exchange for access to Fort Bragg and its haircut customers, Sheffield paid a fee to AAFES for each haircut performed at the Fort Bragg barber shops (R4, tab 1 at 56). The Contract indicated that "[o]nly contracting officers may waive or change contract terms" (R4, tab 1 at 14).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The Contract recognized two types of haircuts:  (1) a "Haircut, Regular" with a price of $8.55; and (2) a "Style Cut" at a price of $10.75 (R4, tab 1 at 48).  The Contract defined these two haircuts:

> **Haircut, Regular** – A tapered or blocked haircut done with clippers or scissors or a combination of both. Generally done dry. Length of hair doesn't require specialized shaping, layering, or contouring beyond normal blending and tapering. Includes standard military haircuts as outlined in AR 670-1 and AFI 36-2903.
>
> **Style Cut** – A layered haircut done with shears and/or razor. Hair generally longer than normal and an individual effect is created by shaping, layering and contouring of the hair. Often done with wetting the hair and the final result achieved by blow-drying to customer-selected appearance. Shampooing and conditioning enhance results, but are not included in the price and are provided at customer's option. A style cut is a change in hairstyle, including converting a regular haircut to a flat top or a flat top to a regular haircut.

(R4, tab 1 at 48 (emphasis in original)).

The definition of regular haircuts in the Contract referenced Air Force Instruction 36-2903, which provides hair grooming standards (app. opp'n, ex. 8 at 19-20).  The Air Force Instruction directs male service members' hair to have a "[t]apered appearance on both sides and the back of the head, both with and without headgear" (*id.* at 19).  A "tapered appearance" will conform "to the shape of the head, curving inward to the natural termination point without eccentric directional flow, twists or spiking" (*id.*).  "A block-cut is permitted with tapered appearance . . . . Cleanly shaven heads, military high-and-tight or flat-top cuts are authorized" (*id.* at 19-20).

The definition of regular haircuts in the Contract also referenced Army Regulation 670-1, which also includes hair grooming standards.[1]  Similar to the Air Force standard, "The hair must present a tapered appearance" that "conforms to the shape of the head . . ., curving inward to the natural termination point at the base of the neck" (Army Regulation 670-1 at 6).  "Hair that is completely shaved or trimmed closely to the scalp is authorized" (*id.*).

---

[1] https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN30302-AR_670-1-000-WEB-1.pdf.

2

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Generally, a "fade cut is a form of tapering the hair down to the skin without blocking it at the back or around the side at the point of termination" (gov't mot. at ex. G-6, Contracting Officer Bessie Townsend declaration).[2]

One provision of the Contract provided sales figures (incorporating it from the solicitation), which were "based upon sales reported to the Exchange by the prior contractor for the past 12 months" (R4, tab 1 at 10-11; tab 8 at 155-56). Although these figures consisted of gross sales and did not distinguish between "regular" and "style" haircuts, much less "fades" (*see id.*), the prior contractor treated all skintight haircuts, including fade haircuts, as style cuts – not regular haircuts (app. opp'n, ex. 1 – Clayborn Tillison dep. tr. at 16-17; ex. 2 – Kevin Owens decl. ¶ 6; ex. 3 – Dominique Wilson decl. ¶ 5; ex. 4 – Belinda Merritt decl. ¶ 6). The barbers also treated some tapered cuts as regular haircuts but all skintight cuts, including fade cuts with more tapering, as style cuts (app. opp'n, ex. 1 – Tillison dep. tr. at 16-17; ex. 6 – Christina Deardeuff dep. tr. at 92-93, 96).

The barbers working on the prior contract estimated that they billed between 70 percent to 90 percent of haircuts as style cuts based on that interpretation (app. opp'n, ex. 1 – Tillison dep. tr. at 109-10 (90%); ex. 2 – Owens decl. ¶ 9 (70%); ex. 3 – Wilson decl. ¶ 8 (80%); ex. 4 – Merritt decl. ¶ 7 ("vast majority")). An AAFES service business manager who compiled the sales figures used in the solicitation (and later incorporated into the contract) attended a meeting with the prior contractor's barbers, in which the barbers explained that they were treating skintight cuts, including fade cuts, as style cuts. (App. opp'n, ex. 5 – Gov't Interrog. Resp. at 7; ex. 2 – Owens decl. ¶¶ 10-12; ex. 4 – Merritt decl. ¶¶ 9-11; ex. 1 – Tillison dep. tr. at 67-68). At that meeting, an AAFES representative told the barbers to continue charging fades as style cuts (app. opp'n, ex. 2 – Owens decl. ¶¶ 10-12; ex. 4 – Merritt decl. ¶¶ 9-11; ex. 1, Tillison dep. tr. at 67-68). Nevertheless, the Contract (and solicitation) included a disclaimer warning that AAFES "makes no guarantee, either express or implied, that a contractor can achieve the amount

---

[2] Unlike the Army and Air Force regulations referenced in the Contract, the Marine Corps' regulation references a fade haircut but without defining it: "The hair may be clipped at the edges of the side and back and will be evenly graduated all the way around the head (blended or faded and not edged as an outline) from zero length (skin) at the hairline to at least the top orifice of the ear circling around the back of the head, where it may then extend to the maximum hair length." Marine Corps Uniform Regulations, May 1, 2018, 1020.34H, PCN 10200150000, ¶ 1004-7a(1)(a), https://www.marines.mil/portals/1/Publications/MCO%201020.34H%20v2.pdf?ver=2018-06-26-094038-137 (visited on May 15, 2024). The Marine Corps regulation appears to require more of a skintight cut than the Army and Air Force regulations.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

of sales for barber services obtained by the previous contractor as listed in this solicitation" (R4, tab 1 at 11; tab 8 at 156).

Prior to submitting an offer, Sheffield's managing member attended a site visit on January 28, 2015, conducted by the same AAFES service business manager that had compiled the sales figures for the solicitation (app. opp'n, ex. 6 – Christina Deardeuff dep. tr. at 27; R4, tab 10 at 257 (discussing date of site visit)). Sheffield's managing member observed a barber perform a fade cut and charge the customer for a style cut (app. opp'n, ex. 6 – Deardeuff dep. tr. at 27; ex. 7 – Deardeuff decl. ¶ 5). The barber explained that any time he used his edgers for a skintight cut, he charged it as a style cut (app. opp'n, ex. 6 – Deardeuff dep. tr. at 27; ex. 7 – Deardeuff decl. ¶ 6). AAFES's representative confirmed that the barber was correct (app. opp'n, ex. 6 – Deardeuff dep. tr. at 27; ex. 7 – Deardeuff decl. ¶ 7).

AAFES had set the deadline for submitting questions to the agency for January 28, 2015 (R4, tab 9 at 248 ("Questions and answer deadline of 28 January 2015 has expired. Therefore, no further questions will be accepted."); *id* at 255 ("Any technical questions you have after reviewing the solicitation should be submitted by email to the Contracting Officer . . . by 28 January 21, 2015, no later than 2:00 P.M. CST.")). On January 29, 2015, AAFES issued an amendment to the solicitation and addressed several questions that had been previously submitted (R4, tab 9 at 250).

On January 29, 2015, the day after the due date for questions, Sheffield emailed AAFES's contracting officer seeking clarification regarding several issues with the solicitation and questioning the categorization and pricing of style cuts (R4, tab 10). As pertinent here, Sheffield discussed the January 28, 2015 site visit and noted that "[w]hile in the presence of AAFES personnel, haircuts were performed known as a 'high fade' and the customer was charge[d] as a 'style' cut at the rate of $10.75" (R4, tab 10 at 261). Sheffield continued:

> In our current contract, any cuts that are military regulation for the rank of customer are to be charged the "regular" rate. The observed current concessionaire services performed were cuts known as "high fades and medium fades". By specification, a "style cut" is a cut done with shears, or longer than normal hair. The current concessionaire employee stated the only cut that is charged at "basic" rate is the cut known as "high and tight". All cuts observed were done with clippers and edgers yet, all were charged $10.75 rate. With the inconsistent AAFES standards of enforcement, the current Concessionaire has direct bidding advantage as bidders may be presented with inaccurate sales information to calculate wage projections, overhead amounts needed for supply costs.

4

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

(R4, tab 10 at 261)  Sheffield noted that, for the barber shop it had visited, "the Oct 2014 sales are reported in the solicitation at $2322 which computes to 216 style cuts" (R4, tab 10 at 261-62).  AAFES's contracting officer did not respond to Sheffield.

Notwithstanding its concerns, Sheffield submitted an offer, and AAFES awarded Sheffield the Contract on February 10, 2015 (R4, tab 1).  In pricing its proposal, Sheffield relied on AAFES's practice of allowing the contractor to price skintight cuts as a style cut, which Sheffield had learned during the site visit (app. opp'n, ex. 7 – Deardeuff decl. ¶ 8).  Sheffield hired many of the barbers from the prior contract and continued the practice of the prior contractor by charging customers for a style cut when they received a skintight cut (app. opp'n, ex. 7 – Deardeuff decl. ¶ 9; ex. 2 – Owens decl. ¶ 13; ex. 3 – Wilson decl. ¶ 10; ex. 4 – Merritt decl. ¶ 12).

Sheffield adopted an interpretation of the Contract to support AAFES's practice.  Sheffield notes a fade haircut requires shaping "beyond normal blending and tapering" to take it from a regular haircut to a style haircut (app. opp'n at 21-24; R4, tab 1 at 48).  Also, Sheffield asserts that regular haircuts require clippers and scissors but that a faded haircut requires a razor (used in style cuts) to achieve a skintight cut (app. opp'n, ex. 7 – Derdeuff decl. ¶¶ 10, 11).  The barbers would use their edgers as a razor to achieve the fade effect, justifying the pricing as a style cut (app. opp'n, ex. 6 – Deardeuff dep. tr. at 27; ex. 7 – Deardeuff decl. ¶ 6).  Thus, all fade cuts were treated as style cuts (app. opp'n, ex. 1 – Tillison dep. tr. at 16-17; ex. 6 – Deardeuff dep. tr. at 92-93, 96).

In April and May 2016, more than 15 months into the contract period, AAFES received two complaints that Sheffield's barbers had charged customers for a style cut when the customers received fade haircuts (R4, tab 12 at 288, 293-94).  On May 19, 2016, AAFES's contracting officer issued a "warning" letter to Sheffield referencing the customer complaints that Sheffield's barbers had charged fade cuts as style cuts (R4, tab 12 at 287).  The letter directed Sheffield to charge fade cuts as regular haircuts:

> Multiple complaints have also been received concerning the shop charging style cut prices for a regular (military standard) haircut.  Per paragraph 1 of Exhibit D, Price Schedule, regular haircuts should be charged a price of $8.55.  A regular haircut includes standard military haircuts as outlined in AR 670-1 and AFI -36-2903.  The complaints specifically mentioned "fades" were charged as a style cut.  Fades are a standard military haircut and should be charged the regular haircut price.

(R4, tab 12 at 287).  To justify this change in how it enforced the Contract's terms, AAFES now points out that a fade cut is synonymous with a tapered cut (like a regular haircut) but does not require (1) wetting to cut the hair (like a style cut), (2) blow-drying

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

to achieve the final result (like a style cut), or (3) shaping, layering, or contouring beyond normal blending and tapering (like a style cut) (gov't mot. at 11; R4, tab 1 at 48).

In response to the contracting officer, Sheffield conducted training that directed the barbers to warn customers that skintight cuts would be charged as style cuts, but if a customer objected, then the barber would only charge for a regular haircut (app. opp'n, ex. 6 – Deardeuff dep. tr. at 63-64).

In 2017 and 2018, customers continued to complain to AAFES that Sheffield's barbers were still charging style prices for fade haircuts (R4, tabs 13-15). In response, Sheffield directed its barbers that "maintaining a haircut [is] a military cut and not a style cut" and should "be charged a military cut and not a style cut" (R4, tab 15 at 318). Notably, Sheffield counseled that "just because you use edgers does not constitute a style cut" (*id*.). Sheffield reiterated that a barber must discuss "with the customer on what you are going to be charging" (*id*.).

Soon thereafter, in 2018, the contracting officer told Sheffield to "cease charging for style cuts altogether" (app. opp'n, ex. 7 – Deardeuff Dec.decl. ¶ 16; ex. 6 – Deardeuff dep. tr. at 63-64).

On August 23, 2019, Sheffield filed a certified claim of $374,868 with the contracting officer asserting three grounds: (1) AAFES had reduced the price of fade haircuts, resulting in a loss of revenue to Sheffield and requiring that AAFES reduce the percentage it should receive from each haircut from 25.75% to 14.51%; (2) AAFES had constructively changed the Contract by recategorizing fade haircuts as regular haircuts; and (3) AAFES had provided unreasonable estimates in the solicitation and Contract (R4, tab 16 at 328-30).

On November 15, 2019, AAFES's contracting officer issued a final decision denying Sheffield's claim, noting that there had been no change in the interpretation of the Contract but that Sheffield previously had been "overcharging the military customers during this contract period" (R4, tab 17 at 334).

Sheffield timely appealed to this Board on January 17, 2020.

## DECISION

AAFES has moved for summary judgment on all three counts of Sheffield's complaint, which allege: (1) AAFES breached the Contract by requiring a price reduction in fade haircuts that resulted in lost revenue; (2) AAFES constructively changed the Contract by requiring Sheffield to recategorize fade haircuts as regular haircuts; and (3) AAFES provided unreasonable estimates in the solicitation and Contract (Compl. ¶¶ 32-53). For the reasons discussed below, we deny summary judgment on the

6

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

first two counts – breach and constructive change – and grant summary judgment on the third count – unreasonable estimates.

I.      *Standard of Review*

Board Rule 7(c) governs summary judgment motions and "looks to Rule 56 of the Federal Rules of Civil Procedure for guidance." ASBCA Rule 7(c)(2); *Fluor Intercontinental, Inc.*, ASBCA Nos. 62550, 62672, 22-1 BCA ¶ 38,105 at 185,099.  FED. R. CIV. P. 56 requires granting "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Beechcraft Def. Co., LLC*, ASBA No. 61743 *et al.*, 23-1 BCA ¶ 38,283 at 185,883.  We view the facts in the light most favorable to the nonmoving party when there is a "'genuine' dispute as to those facts." *Beechcraft*, 23-1 BCA ¶ 38,283 at 185,883 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

II.     *AAFES Waived its Interpretation of the Contract and is Precluded from Changing Positions Without Compensating Sheffield for a Change or Breach*

The dispute regarding the alleged breach of contract and constructive change boils down to whether AAFES could properly change how it enforced the terms of the Contract – whether a fade cut constituted a style cut or regular haircut – after Sheffield changed its interpretation based on AAFES's non-enforcement.  AAFES waived its interpretation of the Contract by non-enforcement of its provisions and is precluded from changing its position without compensating Sheffield for a change or breach.  For the reasons discussed below, AAFES is not entitled to summary judgment because it has failed to show it was entitled to judgment as a matter of law.

"A breach of contract claim requires two components:  (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014).

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)); *see also Bell/Heery*, 739 F.3d at 1335 ("To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract requirements, and (2)

7

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

that the additional work was ordered, expressly or impliedly, by the government.”); *Frazier Invs., Inc.*, ASBCA No. 63001, 23-1 BCA ¶ 38,313 at 186,043.

A constructive change may occur through constructive waiver where the government misinterprets or fails to enforce a provision of a contract and then later changes its position on the interpretation or enforcement of the provision. *Buck Town Contractors & Co.*, ASBCA No. 60939 *et al.*, 20-1 BCA ¶ 37,486 at 182,084-85; *cf. also CDM Constructors, Inc.*, ASBCA No. 60454 *et al.*, 18-1 BCA ¶ 37,190 at 181,012 (“Where as a result of the Government’s misinterpretation of contract provisions a contractor is required to perform more or different work, or to higher standards, not called for under its terms, the contractor is entitled to equitable adjustments pursuant to the Changes Article[.]” (quoting *Emerson-Sack-Warner Corp.*, ASBCA No. 6004, 61-2 BCA ¶ 3248 at 16,827)). “A contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead.” *Gresham & Co. v. United States*, 470 F.2d 542, 554 (Ct. Cl. 1972). In such instances, “the government may waive strict compliance with contractual requirements and be precluded from later re-imposing those requirements upon the contractor.” *Watts Constructors, LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37,563 at 182,387; *see also Sauer, Inc.*, ASBCA No 61847, 21-1 BCA ¶ 37,939 at 184,271 (same).

Here, Sheffield asserts that AAFES constructively waived enforcement of the Contract by initially not enforcing the agency’s categorization of fade cuts as regular haircuts (app. opp’n at 31-34). A constructive waiver occurs where: (1) the contracting officer knew or should have known of the deviation from the language of the contract, (2) the contracting officer acted or failed to act by accepting performance contrary to the contract’s terms, (3) the contractor relied on the agency’s non-enforcement, and (4) injustice would result to the contractor. *Buck Town Contractors*, 20-1 BCA ¶ 37,486 at 182,084-85.

First, AAFES’s contracting officer knew or should have known that the agency was not enforcing its current interpretation of the Contract that a fade cut was a regular haircut, not a style cut. AAFES had not enforced this contractual interpretation for an extended period. *Gresham*, 470 F.2d at 554. The prior contractor had been charging fade cuts as style cuts, and AAFES was aware of this (App. opp’n, ex. 5 – Gov’t Interrog. Resp. at 7; ex. 2 – Owens decl. ¶¶ 10-12; ex. 4 – Merritt decl. ¶¶ 9-11; ex. 1 – Tillison dep. tr. at 67-68). During Sheffield’s site visit prior to bidding on this Contract, AAFES’s service business manager approved the charging of fade cuts as style cuts when Sheffield’s representative questioned that approach (app. opp’n, ex. 6 – Deardeuff dep. tr. at 27; ex. 7 – Deardeuff decl. ¶ 7). Surprised by that interpretation, Sheffield then informed the contracting officer that AAFES was allowing the incumbent to charge fade cuts as style cuts, which contradicted how that provision was enforced on another Sheffield contract (R4, tab 10 at 261).

8

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

AAFES asserts that the service business manager was not an authorized government agent to make contract decisions and, thus, her opinions should have no bearing on interpreting the Contract (gov't mot. at 15-20). Indeed, the Contract states that "[o]nly contracting officers may waive or change contract terms" (R4, tab 1 at 14). A government representative "must have actual authority to bind the government," and the Federal government generally lodges that authority with the contracting officer. *Winter v. Cath-dr/Balti J.V.*, 497 F.3d 1339, 1344 (Fed. Cir. 2007); FAR 43.102(a) ("Only contracting officers acting within the scope of their authority are empowered to execute contract modifications on behalf of the Government."). However, as noted above, Sheffield directly informed the contracting officer that fade cuts were being charged as style cuts, so the contracting officer had ***actual*** knowledge this was occurring and did nothing to stop it for the first 15 months of the Contract with Sheffield (R4, tab 10 at 261; tab 12 at 287).[3] Thus, AAFES's contracting officer knew or should have known that AAFES was not treating fade cuts as regular haircuts.

Second, AAFES acted or failed to act by accepting performance contrary to the Contract's terms. *Buck Town Contractors*, 20-1 BCA ¶ 37,486 at 182,085. For the first 15 months of the Contract, AAFES allowed Sheffield to continue charging fade cuts as style cuts (just as it had done with the prior contractor) (app. opp'n, ex. 7 – Deardeuff decl. ¶ 9). AAFES did not start enforcing its current interpretation of the Contract until customers complained about Sheffield charging fade cuts as style cuts ((R4, tab 12 at 287; tabs 13-15). Thus, AAFES's inaction resulted in acceptance and acquiescence to Sheffield's performance that charged fade cuts as style cuts.

Third, Sheffield relied on AAFES's non-enforcement. *Buck Town Contractors*, 20-1 BCA ¶ 37,486 at 182,085. AAFES asserts that Sheffield's actions during contract performance contradict its litigation position that relied on AAFES allowing fade cuts to be charged as style cuts (gov't mot. at 13-14; gov't reply at 19-20). In these circumstances, we may "look at the conduct of the parties." *Gresham*, 470 F.2d at 555. Indeed, the parties' conduct in performing a contract prior to the advent of controversy provides "the most accurate picture of the parties' intent" regarding their treatment of

---

[3] Even if the contracting officer did not have actual knowledge, she could still have ratified the service business manager's non-enforcement. *BGT Holdings LLC v. United States*, 984 F.3d 1003, 1013 (Fed. Cir. 2020) ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." (quoting RESTATEMENT (THIRD) OF AGENCY § 4.01)). And, in these circumstances, we may impute knowledge to the contracting officer. *Gresham*, 470 F.2d at 555-6 ("Assuming arguendo that the QAR representatives lacked the necessary authority, we think only one finding is possible: that the contracting officer knew or should have known of the situation, and that the authority was in his hands. If he did not know, he ought to have known, and knowledge is imputed to him.").

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

contract terms. *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1290-91 (Fed. Cir. 2008) (citing *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983) and *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972)); *Anderson Contracting, LLC*, ASBCA No. 63632, 24-1 BCA ¶ 38,566 at 187,450 ("The parties' pre-dispute conduct during contract performance is of great weight in attempting to resolve ambiguous provisions of a contract."). AAFES points to Sheffield's managing member, who told barbers that it was incorrect to price fade haircuts as style cuts and Sheffield charged fade cuts as regular cuts at a different fort (gov't mot., ex. G-5 – Tillison dep. tr. at 54-57). And, in its pre-award notice of inquiry to AAFES, Sheffield stated that concern – particularly that the incumbent would have an advantage due to AAFES's enforcement of how fade cuts should be priced (R4, tab 10 at 261). AAFES contends that this was Sheffield's position while performing the Contract and that Sheffield's position never changed until it pursued litigation.

Sheffield responds that, once it learned that AAFES interpreted the Contract to allow fade cuts to be charged as style cuts, Sheffield consistently held and acted on that position until AAFES's contracting officer unilaterally directed Sheffield to charge fade cuts as regular haircuts 15 months into performing the Contract (app. opp'n at 33-34). Sheffield's offer relied on AAFES's statements that fade cuts were charged as style cuts (app. opp'n, ex. 7 – Deardeuff decl. ¶ 8). In other words, Sheffield changed its position in response to AAFES's interpretation of how the Contract would be enforced. Indeed, Sheffield hired many of the incumbent barbers, who continued to charge fade cuts as style cuts (app. opp'n, ex. 7 – Deardeuff decl. ¶ 9; ex. 2 – Owens decl. ¶ 13; ex. 3 – Wilson decl. ¶ 10; ex. 4 – Merritt decl. ¶ 12). Sheffield reiterates that it only changed the way it treated fade cuts in May 2016 (15 months into performance) when the contracting officer directed Sheffield to cease treating fade cuts as style cuts (app. opp'n, ex. 6 – Deardeuff dep. tr. at 63-64). In fact, AAFES continued getting complaints in 2017 and 2018 that Sheffield was still charging style prices for fade haircuts, so Sheffield resisted changing its charging practices even longer (R4, tabs 13-15). Thus, Sheffield relied on AAFES's enforcement inaction, which resulted in Sheffield changing its position when submitting its offer and during contractual performance.

Fourth, injustice would result if we allowed the contracting officer to enforce its current interpretation of the Contract without compensation to the contractor. *Buck Town Contractors*, 20-1 BCA ¶ 37,486 at 182,084-85. Here, as noted above, Sheffield changed its position before bidding on the Contract because AAFES made it clear that it treated fade cuts as style cuts. It would be inequitable for Sheffield to bear the costs of AAFES's failure to enforce the Contract's provisions over an extended period of time.

Ultimately, AAFES's inaction and non-enforcement took an agreement that might have been unambiguous and made it ambiguous. *Gresham*, 470 F.2d at 555 (noting it is no different "whether defendant has originally written an ambiguity into a contract, or has administered an initially unambiguous contract in such a way as to give a reasonably

10

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

intelligent and alert opposite party the impression that a contract requirement has been suspended or waived"). AAFES could not suddenly revive the requirement to treat fade cuts as regular haircuts after Sheffield changed its position to conform to AAFES's non-enforcement of the Contract. *Id*. ("[T]he requirement cannot be suddenly revived to the prejudice of a party who has changed his position in reliance on the supposed suspension."). Thus, we deny AAFES's summary judgment motion as to the first two counts because the agency is not entitled to judgment as a matter of law.

III.  *Sheffield Was Not Misled Because it Knew the Basis of the Estimates*

Sheffield asserts that AAFES prepared unreasonable and negligent estimates by incorporating the sales data for the prior contractor into the solicitation and Contract, where AAFES's service business manager knew that the sales data was based on charging fade cuts as style cuts (app. opp'n at 36-40). AAFES asserts that Sheffield cannot pursue this theory because Sheffield knew that the solicitation's estimates were based on the practice of pricing fade cuts as style cuts (gov't reply at 10, 12). We grant the government's summary judgment motion on this count of Sheffield's complaint.

To establish an unreasonable or negligent estimate "requires the contractor to show by preponderant evidence that the government's estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made.'" *Agility Def. & Gov't Servs., Inc. v. United States*, 847 F.3d 1345, 1350 (Fed. Cir. 2017) (quoting *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992)). The contractor also must establish that it reasonably relied on the negligent estimate in preparing its offer. *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1341 (Fed. Cir. 2003) ("Where the Government's estimate is negligently prepared and appellant reasonably relies upon that estimate to its financial detriment, the remedy is an equitable adjustment." (quoting *HKH Cap. Hotel Corp.*, ASBCA No. 47575, 98-1 BCA ¶ 29,548 at 146,472)). Where a contractor is not misled by the estimates, the contractor "cannot recover because it made an affirmative decision to bid on a specification, which it knew to be inaccurate." *Robins Maint., Inc. v. United States*, 265 F.3d 1254, 1258 (Fed. Cir. 2001).

Here, AAFES neither provided a negligent estimate nor misled Sheffield regarding the meaning of the estimated sales data included in the solicitation (and later in the Contract). Sheffield asserts that AAFES prepared unreasonable and negligent estimates by incorporating the sales data for the prior contractor into the solicitation and Contract, where AAFES's service business manager knew that the sales data was based on charging fade cuts as style cuts (app. opp'n at 36-40). "The critical measure for determining whether an estimate was negligently prepared is whether the estimate is based upon all relevant information that is reasonably available to the government at the time of award." *MPG West, LLC*, ASBCA No. 61100 *et al.*, 20-1 BCA ¶ 37,739 at 183,147, *aff'd in part, vacated & remanded, in part, on other grounds*, No. 2023-1430,

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

2024 WL 2239021 (Fed. Cir. 2024). According to Sheffield, if AAFES knew at the time of issuing the solicitation and awarding the Contract that it defined a fade cut as a regular haircut, then its estimates and information provided to offerors should have reflected that interpretation (app. opp'n at 36-40). As noted above, however, at the time AAFES provided these estimates, AAFES permitted the prior contractor to charge fade cuts as style cuts (App. opp'n, ex. 5 – Gov't Interrog. Resp. at 7; ex. 2 – Owens decl. ¶¶ 10-12; ex. 4 – Merritt decl. ¶¶ 9-11; ex. 1 – Tillison dep. tr. at 67-68). Far from being unreasonable, the estimates accurately reflected the agency's practice at the time, which allowed a barber to price fade cuts as style cuts.

Moreover, Sheffield did not rely to its detriment on these estimates because it was not misled by the estimates. It knew precisely what the estimates meant. For example, AAFES points to Sheffield's communication to AAFES before submitting its offer, where Sheffield questioned the incumbent's practice of pricing fade cuts as style cuts, including accurately analyzing the estimates based on that information (gov't reply at 12; R4, tab 10 at 261). In fact, Sheffield's reliance on the accuracy of the estimates is one piece of evidence supporting its allegations that AAFES committed a breach or a constructive change (as we discussed at length above). Yet, to establish an unreasonable estimate, Sheffield must maintain the diametrically opposed position that the estimates were inaccurate. Consistent with its claim and at the pleading stage, a party may allege alternative, inconsistent theories of recovery. *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009) (discussing that FED. R. CIV. P. 8(d)(3) allows a party to plead inconsistent theories of recovery); *Lockheed Martin Aeronautics Co.*, ASBCA No. 62209, 22-1 BCA ¶ 38,178 at 185,417 (recognizing "the general right of a party to seek redress under alternative legal theories of recovery"), *appeal dismissed*, No. 2024-2259, 2024 WL 5153003 (Fed. Cir. 2024). But, when undisputed material facts support only one theory of recovery at the summary judgment stage, we should settle the contradictions. *Stockton*, 583 F.3d at 1369 ("[A] party can obtain only one recovery for a single harm regardless of how many legal theories there may be for a recovery.").

Here, the undisputed facts demonstrate that Sheffield understood that the estimates accurately described the incumbent contractor's practice, which resulted in Sheffield knowingly and accurately bidding on the Contract (app. opp'n, ex. 7 – Deardeuff decl. ¶ 8). Thus, Sheffield cannot show adverse reliance on an unreasonable estimate. *Servicios Profesionales de Mantenimiento, S.A.*, ASBCA No. 52631, 03-2 BCA ¶ 32,276 at 159,680-81 (rejecting unreasonable estimate claim where there was a "lack of proof of reliance on its presently proffered interpretation"); *see also Applied Cos.*, 325 F.3d at 1341.

Ultimately, there is no genuine dispute of material fact and judgment as a matter of law is appropriate regarding Sheffield's allegations of unreasonable or negligent estimates. Thus, we grant AAFES summary judgment on Sheffield's unreasonable estimates count.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

CONCLUSION

For the foregoing reasons, we deny AAFES's motion for summary judgment on Sheffield's breach of contract and constructive change counts, and grant summary judgment on Sheffield's unreasonable estimates count. On or before May 15, 2025, the parties shall submit a joint status report stating how they wish to further proceed in this appeal.

Dated: April 4, 2025

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62367, Appeal of Sheffield Barbers, LLC, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals