ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Peraton, Inc. | )  ASBCA No. 62853 |
| | ) |
| Under Contract No. N00178-05-D-4395 | ) |

APPEARANCES FOR THE APPELLANT:    Kevin P. Mullen, Esq.
Caitlin A. Crujido, Esq.
  Morrison & Foerster LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Allison M. McDade, Esq.
  Navy Chief Trial Attorney
Devin A. Wolak, Esq.
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal concerns a cost-plus-fixed-fee, level-of-effort task order issued to Peraton, Inc. (Peraton or appellant) for technical systems engineering support services for the Navy's Fleet Systems Engineering Team (FSET). The Navy issued the FSET I task order under the Seaport Enhanced (Seaport-e) Multiple Award Contract vehicle, an indefinite delivery, indefinite quantity (IDIQ) contracting mechanism designed to streamline service acquisition for the Navy.

This appeal is being conducted pursuant to the Board's Rule 11 procedures, which permit the parties to waive a hearing and submit the matter for decision on the written record. Pursuant to Rule 11, the Board decides the weight to be given any evidence and may make findings of fact on disputed facts. Board Rule 11(d). This proceeding determines only Peraton's entitlement to the claimed costs, not the specific amounts.

This appeal involves identical legal issues as the appeals of Vectrus Systems Corporation (Vectrus) in ASBCA Nos. 62685 and 62949, involving a successor contract, known as the FSET II contract. Peraton and Vectrus share the same counsel and the Vectrus appeal was briefed on the same schedule pursuant to Board Rule 11.

The central dispute is whether Peraton is entitled to its full fixed fee based on the Navy's initial estimated hours, despite the Navy's actual requirements being substantially lower. Peraton contends its fixed fee represents the agreed-upon profit,

while the Navy maintains it is obligated to pay only for actual costs plus a fee proportionate to the work performed.

We conclude that Peraton has been paid its fee in accordance with the express terms of the contract and that it is not entitled to any additional fee. For the reasons stated below, we deny the appeal.

FINDINGS OF FACT

I.      The FSET I Contract

1. On May 31, 2005, the Navy awarded Contract No. N00178-05-D-4395 to ITT Industries, Inc., Systems Division (R4, tab 107 at GOV7508). ITT Industries is a corporate predecessor to the appellant, Peraton, Inc. This contract is known as the "FSET I contract." The FSET I contract is part of the multiple award Seaport Enhanced (Seaport-e) contract vehicle designed to streamline acquisition for the Navy, United States Marine Corps, and other Navy activities (*id.* at 7515).

2. The FSET I contract is an indefinite-delivery, indefinite quantity contract with a minimum government obligation of $2,501 (*id.* at 7509, 7513, 7515). It contemplates the issuance of multiple task orders requiring the provision of "qualified personnel, materials, facilities, equipment, test instrumentation, data collection and analysis hardware and software, and other services that will support the Navy in the execution of their missions" in 22 specified fields of expertise (*id.* at 7515-19).

3. The terms and conditions set forth in the FSET I contract apply to all task orders issued pursuant to the contract (*id.* at 7524). The contract incorporates Federal Acquisition Regulation (FAR) 52.216-18, ORDERING (OCT 1995), which states that "[i]n the event of a conflict between a delivery order or task order and this contract, the contract shall control" (*id.* at 7553).

4. The FSET I contract permits the award of cost-plus fixed-fee IDIQ orders (*id.* at 7525). A "cost-plus fixed-fee" contract is a cost reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract. FAR 16.306(a).

5. FAR 16.306(d) describes two types of cost-plus-fixed-fee contracts: completion and term. Completion contracts define a specific deliverable and budget, allowing for increased effort without increased fee if the project goes over budget. The FSET-II task order is "term" form contract, meaning that the contract defines a level of effort over a specific time, with payment upon satisfactory completion of that period. FAR 16.306(d).

6.  The FSET I contract provides for the issuance of "term" task orders, which it describes as follows:

> The term form [of task order] describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated period of time.  Under this form [of task order], if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period and upon contractor certification that the level of effort specified in the order has been expended in performing the contract work.

(R4, tab 107 at 7525)

7.  The FSET I contract includes clause SEA 5252.216-9122, LEVEL OF EFFORT (DEC 2000).  Subsection (a) of the clause states:

> (a) The Contractor agrees to provide the total level of effort specified in the next sentence in performance of the work described in Sections B and C of this contract.  The total level of effort for the performance of this contract shall be (to be completed for each order) total man-hours of direct labor, including subcontractor direct labor for those subcontractors specifically identified in the Contractor's proposal as having hours included in the proposed level of effort.

(*Id.* at 7526) (emphasis in original)  Pursuant to this clause, the contractor agrees to dedicate a specific number of hours (level of effort or LOE) to the project (as detailed in Sections B & C of the contract, which describe *what* work needs to be done).  This includes hours worked by any subcontractors the contractor uses.  This number will be filled in when each specific order is placed.

8.  Subsection (e) of clause SEA 5252.216-9122 addresses when the contractor accelerates the work.  It provides that, if the contractor foresees exhausting the allocated hours (level of effort or LOE) before the contract end date, it must notify the Task Order Contracting Officer in writing, proposing an acceleration plan at no additional cost or fee, along with a proposal for continued work through the contract term.  If the contracting officer (CO) approves the proposal, then it becomes a binding agreement via contract modification.  *Id.* at 7527

3

9.  Subsection (f) of SEA 5252.216-9122 addresses when the government accelerates the work.  It provides that the CO can order the contractor to speed up the work and use all the budgeted hours before the contract's end date.  This order will specify how much faster the work needs to go and the new, shorter deadline.  The contractor has five days to acknowledge the order.  *Id.* at 7527.

10.  Subsection (g) addresses when the actual hours are less than the budgeted hours.  Under subsection (g) of SEA 5252.216-9122, if the contractor does not use all of the budgeted hours, the CO can either reduce the contractor's profit proportionally to the unused hours or make the contractor keep working until all the hours are used up, without paying any extra fee.  "If the total level of effort specified in paragraph (a) above is not provided by the Contractor during the period of this contract, the Task Order Contracting Officer, at its sole discretion, shall either (i) reduce the fee of this contract" pursuant to the following formula:

$$\text{Fee Reduction} = \frac{\text{Fee (Required LOE} - \text{Expended LOE)}}{\text{Required LOE}}$$

Subsection (g) further states the CO alternatively may "require the contractor to continue to perform the work until the total number of man-hours of direct labor specified in paragraph (a) above shall have been expended, at no increase in the fee of this contract."  (R4, tab 107 at 7527)

11.  The FSET I contract requires the contractor to perform detailed accounting work and wrap-up "[w]ithin 45 days after completion of the work under each separately identified period of performance hereunder . . . . [including a calculation of] the appropriate fee reduction in accordance with this clause."  *Id.* at 7528.

12.  The FSET I contract incorporates FAR 52.232-32 Performance Based Payments, which provides in pertinent part:

> (2) If at any time the amount of payments under this contract exceeds any limitation in this contract, the Contractor shall repay to the Government the excess. Unless otherwise determined by the Contracting Officer, such excess shall be credited as a reduction in the unliquidated performance-based payment balance(s), after adjustment of invoice payments and balances for any retroactive price adjustments.

*Id.* at 7555.

4

13.  The FSET I contract specifies that responses to task order solicitations must include, at a minimum (and among other things) "a detailed cost per hour and the applicable fixed fee per hour of all resources required to accomplish the task as set forth in the TO" (*id.* at 7534).

14.  The FSET I contract imposes an 8 percent cap on any fee applied to task orders (*id.* at 7541 ("Maximum Pass Through Rates")).

II.      The Solicitation and Appellant's Proposal

15.  On March 20, 2013, the Space and Naval Warfare Systems Command[1] (SPAWAR) issued Solicitation No. N00024-13-R-3069 under the FSET I contract, seeking competitive offers to provide technical systems engineering support (R4, tab 1 at 1-2).

16.  The solicitation described a cost-plus-fixed-fee, level-of-effort task order with a one-year base and two one-year options, plus two possible award term years for exceptional performance (*id.* at 3-4, 17).  The Navy provided estimated direct labor hours for each year, requiring offerors to calculate their fixed fee and resulting hourly rate based on those hours (*id.* at 4-5).  This hourly rate, derived by dividing the total proposed fixed fee by the total estimated labor hours, would be used for billing and payment.  *Id*.

17.  Section L-2 of the solicitation states that the actual hours may differ from the estimated labor hours:

> This estimate provides the number of hours the contractor will be required to perform during contract performance; however, actual contract performance may vary from this estimate.  Accordingly, the Government cannot guarantee the contractor will perform the estimated hours shown for either the individual labor categories or the total estimated hours.

*Id.* at 58.

---

[1] On June 3, 2019, SPAWAR was changed to Naval Information Warfare Systems Command, or NAVWAR for short to align its identity with the mission of "supporting naval warfare from seabed to space." https://www.public.navy.mil/navwar/Atlantic/Documents/AboutUs/191212_NIWCAtlantic_CommandOverview.pdf

18. The Performance Work Statement is attached to Section J of the solicitation (R4, tab 200 at A_000001). The Performance Work Statement repeatedly advises offerors that the Navy's actual requirements under the Task Order will be determined and filled on an "emergent" basis and as requested by various authorized government personnel (*id.* at A_000003-10). The Performance Work Statement requires the contractor to provide a variety of specified technical services at the direction of the government official or employee authorized to give direction under the FSET I task order (R4, tab 4 at A000003-9).

19. The solicitation included a deadline for offerors to submit questions and Peraton did not submit any questions (R4, tab 1 at 64, tab 268, Maureen DiGiacomo dep. tr. at 60-61). Vectrus did not submit any questions because it was concerned that doing so would put it at a competitive disadvantage (DiGiacomo dep. tr. at 60-61).

20. Peraton's May 30, 2013 proposal followed the solicitation's pricing methodology (R4, tab 105.2 at 7499). Peraton calculated its total estimated labor costs, including subcontractor costs, for each potential contract year (*id.*). It then applied a 6% fee to its own labor costs and a 3% fee to subcontractor labor costs, summing these amounts to determine its total proposed lump-sum fixed fee per year (*id.*). Peraton then divided this lump-sum total fixed fee by the Navy's total estimated labor hours to arrive at an hourly rate for billing (*id.*).

III.   The FSET I Task Order

21. On September 16, 2013, the Navy awarded Peraton the FSET I task order (R4, tab 34 at 395).

22. Section B-3 of the Task Order, entitled "Fee Determination and Payment (Level of Effort)," sets forth the estimated hours for each contract period and describes how the fixed fee will be paid (*id.* at 398).

23. Subsection (a) of Section B-3, entitled "Total Estimated Hours," states that the estimated hours presented in the subsection (d) table are "estimate[s]." The Navy estimated between 333,880 and 351,760 hours for each performance period. *Id.* at 398-99

24. The Navy built its estimate of the hours per performance period based on a number of factors, including planned strike group deployments and historical needs. The estimate was intended to be a ceiling or maximum number of hours per performance period. (R4, tab 249, Paul Guerra dep. tr. at 18-20)

6

25.  Subsection (c) of Section B-3 addresses what happens when the CO decides to adjust the task order amount or the amount of estimated total hours.  It provides:

> *If the contracting officer determines, for any reason, to adjust the task order amount or the estimated total hours set forth above, such adjustments shall be made by task order modification.*  Any additional hours will be fee bearing, and the additional negotiated fee will be divided by the additional estimated hours to determine a new fee (applicable to the additional hours only).  If the fee for these additional hours is different from that of the original estimated hours, these hours shall be kept separate from the original estimated total hours.
>
> The estimated cost of the task order may be increased by written modification, if required, due to cost overruns.  This increase in cost is not fee bearing and no additional hours will be added.

(R4, tab 34 at 398) (emphasis added)

26.  Section B-3(d), entitled "Payment of Fee," explains how the fixed fee will be paid to the contractor.  It incorporates into the task order appellant's proposed fixed fee and fee per direct labor hour for each year by Contract Line Item Number (CLIN) in a table as follows:

| TABLE | CLIN | Fixed Fee | Hours | Fee Per Direct Labor Hour |
|---|---|---|---|---|
| Base Period | 4001 | $1,094,224.41 | 333,880 | $3.2773 |
| Option Period I | 7101 | $1,125,151.70 | 346,580 | $3.2464 |
| Option Period II | 7201 | $1,134,513.85 | 349,360 | $3.2474 |
| Award Term I | 7301 | $1,137,321.30 | 350,560 | $3.2443 |
| Award Term II | 7401 | $1,141,395.14 | 351,760 | $3.2448 |

It further states that the government will pay the contractor based on the hourly rate, subject to a 15% hold-back:

> The Government shall pay fixed fee to the contractor on each direct labor hour performed by the contractor or subcontractor, at the rate of [SEE TABLE] per labor hour invoiced by the contractor subject to the contract's "Fixed

Fee" clause, provided that the total of all such payments shall not exceed eight-five percent (85%) of the fixed fee specified under the task order. Any balance of fixed fee shall be paid to the contractor, or any overpayment of fixed fee shall be repaid by the contractor, at the time of final payment.

Nothing herein shall be construed to alter or waive any of the rights or obligations of either party pursuant to the FAR 52.232-20 "Limitation of Cost" or FAR 52.232-22 "Limitation of Funds" clauses, either of which is incorporated herein by reference.

Section B-3(d) further provides that:

The fee shall be paid to the prime contractor at the per hour rate specified in this paragraph regardless of whether the contractor or subcontractor is performing the work.

The Government reserves the right to transfer unused ceiling from one period to another as needed.

(R4, tab 34 at 398-99)

IV.     Performance Under the FSET-II Task Order

27. The Navy regularly collected information on potential jobs under the FSET I task order, primarily from SPAWAR and other eligible groups. Customer needs, influenced by budgets and mission requirements, drove demand (Guerra dep. tr. at 11-13, 18-19; R4, tab 250, Luis Lopez dep. tr. at 9-12, 32-35). The Navy would then request a rough order of magnitude (ROM) pricing and level of effort estimates from Peraton for the customer to review. Approved jobs were added to the contractor's workload. (Guerra dep. tr. at 12; Lopez dep. tr. at 10-11)

28. In each performance period of the FSET 1 task order, the Navy's actual requirements were lower than the estimates that had been provided in the solicitation and the FSET 1 task order itself (R4, tab 105.2 at 7503).

29. Beginning in May 2017, without informing the Navy, Peraton began preparing its ROM estimates by re-calculating its fee rate per direct labor hour using the level of effort it had determined to be appropriate under that year's ROM process (R4, tab 254 at 1). This resulted in a higher hourly rate for profit than set forth in the contract: $4.11 instead of $3.2448 (*id.* at 3).

8

30.  The Navy remained unaware of Peraton's unilateral fee adjustment until July 25, 2017, when Vectrus requested a meeting to discuss correcting the fee (*id.* at 1).  During an August 14, 2017, meeting, the Navy learned about Peraton's position on the proposed adjustment and the fact that Peraton had been unilaterally adjusting its fee on recent ROM estimates (*id.* at 1-2).

31.  On August 15, 2017, the Navy instructed Peraton to correct its ROM estimates to reflect the contractually stated hourly rate for profit (*id.* at 2).  Peraton then submitted additional ROMs on August 16, 2017, using its adjusted hourly rate for profit, but the Navy rejected them and reiterated its instruction (*id.*).  On August 17, 2017, Peraton requested permission again to use its adjusted hourly rate for profit, but the Navy denied the request and again directed Peraton to resubmit using the contractually stated hourly rate for profit (*id.* at 2-3).  Finally, on August 18, 2017, Peraton complied with the Navy's direction (*id.* at 3).  The Navy met with Peraton later that day to reinforce the requirement to use the contractually stated hourly rate for profit (*id.*).

32.  The Navy paid actual fixed fees for each performance period that were approximately two-thirds of the original lump-sum fixed fee.

| Year | Original Lump-Sum Fee | Fixed Fee Paid |
|---|---|---|
| Base Year | $1,094,224 | $829,815 |
| Option Year 1 | $1,125,152 | $767,995 |
| Option Year 2 | $1,134,514 | $779,642 |
| Award Term 1 | $1.137,321 | $750,798 |
| Award Term 2 | $1,141,395 | $719,838 |
| Extension | $570,698 | $271,312 |

(R4, tab 105.2 at 7504)

V.      The Claim and Subsequent Appeal

33.  On September 30, 2020, Peraton submitted a pass-through certified claim from Vectrus dated September 28, 2020 (R4, tabs 105.1, 105.2).  The claim sought $2,083,904, which represents the difference between the annual full fixed fee for each period of performance under the FSET I task order ($6,203,304), less that portion of the full fixed fee actually paid by the Navy pursuant to Section B-3(d) of the task order ($4,119,400) (R4, tab 105.2 at 7498-505).  According to the claim, the base year performance period began on September 16, 2013, and ended on September 15, 2014.  The final extension period began on September 16, 2018 and ended on March 15, 2019 (*id.* at 7498).

9

34. The CO denied the claim in a final decision dated February 10, 2021 (R4, tab 106). On March 17, 2021, appellant filed a timely notice of appeal to the Board.

DECISION

I. Legal Standard

This proceeding determines only Peraton's entitlement to the claimed costs, not the specific amounts. Pursuant to Board Rule 11(a), the parties have waived a hearing and submitted the matter for decision on the record. While this expedites the process, Peraton retains the burden of proof. The Board will weigh the evidence and make findings of fact, including on disputed facts. *See* Board Rule 11(a), (d); *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13).

II. Contract Interpretation

The fundamental question we must address is whether the Navy's refusal to renegotiate the fixed fee constitutes a breach of contract when the Navy ordered only two-thirds of its estimated hours under the FSET-I task order.

A. The Contract Contains No Requirement to Renegotiate The Fixed Fee if Actual Hours Fall Short of Estimated Hours

Contract interpretation begins and ends with the contract language. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006)). The contract should be read as a whole, harmonizing all parts and avoiding interpretations that render any part meaningless. *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922; *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002). A provision susceptible to multiple reasonable interpretations is ambiguous. *TEG-Paradigm*, 465 F.3d at 1338.

Peraton relies exclusively on Section B-3(c) of the FSET-II task order to support its argument that the contract imposes a mandatory duty to modify the contract if the actual hours are less than the estimated hours for a given performance period (app. br. at 11-12). The first sentence of Section B-3(c) states: "If the contracting officer determines, *for any reason*, to adjust the task order amount or the estimated total hours set forth above, such adjustments shall be made by task order modification" (finding 25) (emphasis added). Peraton contends that the phrase "for any reason" creates a mandatory duty to modify the contract if the hours are less than estimated (app. br. at 12).

10

The plain language of Section B-3(c) states that a contract modification shall occur only "[i]f the contracting officer determines" that a modification is necessary. This gives the CO complete discretion to determine whether to modify the contract. The following phrase "for any reason" clarifies the breadth of that discretion. Under appellant's interpretation of Section B-3(c), the CO would be *required* to modify the contract – a position at odds with the provision's plain language and with the CO's discretion.

When read in its entirety, Section B-3(c) addresses only what happens when the number of hours *increases*. It explains that if more work is needed beyond the original estimate, a new fee will be calculated for these extra hours, and if that fee is different from the original fee, the extra hours will be tracked separately. The total cost of the task order can be increased if costs go over budget, but this increase will not include any additional fee or hours. (Finding 25)

Section B-3(c) says nothing about what happens if the actual hours worked are *less* than the estimated hours. There is no mention of a fee reduction or any other adjustment if fewer hours are needed. Peraton acknowledges this fact, but insists that Section B-3(c) "contains no indication that the requirement for a modification does not also apply to a decrease in direct labor hours as well" (app. br. at 12). However, the issue of decreased hours is addressed squarely in clause SEA 5252.216-9122(g) as we discuss next.

B.  Section B-3(c) Must Be Harmonized With The Rest of the Contract

Section B-3(c) must be interpreted within the context of the entire contract. *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009), (quoting *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) (contracts must be interpreted "'to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract'").

Peraton's interpretation of Section B-3(c) ignores other provisions of the contract. Specifically, Section B-3(c) addresses when the CO determines that the Navy's needs are *greater* than the initial estimate for the period. When the Navy's actual needs are *less* than initially estimated, clause SEA 5252.216-9122(g) requires the CO to either reduce the fixed fee proportionally to the unused level of effort (LOE) or extend the contract term until the full LOE is used (finding 10). The FSET I task order's payment mechanism automatically implements the first option, paying a proportional fee for each direct labor hour invoiced (finding 26).

Peraton argues that the "level of effort" clause is inapplicable, because it applies only when the contractor fails to provide the LOE, not the government (app. reply br. at 8). We disagree. Subsection (g) of SEA 5252.216-9122 states that fee

11

reduction applies "[i]f the total level of effort specified in paragraph (a) above is not provided by the Contractor during the period of this contract." Subsection (g) does not address causation and does not distinguish between whether the contractor or the government caused the level of effort to fall below the estimate. While Peraton focuses on "by the Contractor," the key phrase is "is not provided." The clause is broad enough to cover any situation where the total estimated level of effort is not ultimately performed, irrespective of whether the contractor was unable to perform or the government simply did not order the full amount of work.

Thus, Peraton incorrectly interprets Section B-3(c) by ignoring clause SEA 5252.216-9122(g), which mandates a proportional fee reduction when the Navy's actual needs are less than initially estimated, regardless of whether the contractor or the government caused the reduced level of effort.

C. Our Interpretation is Consistent With Cost-Plus Contracting Principles

Our interpretation of Section B-3(c) is consistent with the overall structure and intent of a cost-plus contract. These types of contracts are designed to shift the risk of cost fluctuations to the government, guaranteeing the contractor reimbursement for allowable costs. See *Fluor Enters., Inc. v. U.S.*, 64 Fed. Cl. 461, 463 (2005) (noting that in cost-plus fixed-fee contracts the government reimburses the contractor's costs, shielding them from unexpected cost increases). Peraton's argument that it is entitled to profit based on initial estimates, even when significantly less work is required, would shift the risk back to the government, contradicting the fundamental purpose of a cost-plus contract. Moreover, the automatic fee adjustment mechanism tied to actual labor hours invoiced already exists within the contract, further weakening the need for modification based on B-3(c).

Our position is consistent with the Court of Federal Claims in *Amtec Corp. v. United States*, 69 Fed. Cl. 79 (2005), *aff'd*, 239 Fed. Appx. 585 (Fed. Cir. 2007). In *Amtec*, the contractor argued it was entitled to the maximum fixed fee for unused labor hours in the option period of a cost-plus-fixed-fee contracts once the government exercised any portion of the option. The court sided with the government, holding that the contract language clearly tied the fixed fee to the incremental labor hours actually exercised, not the maximum potential hours. *Amtec*, 69 Fed. Cl. at 87.

For these reasons, Peraton's interpretation of Section B-3(c) as mandating renegotiation is unsustainable when considering the contract in its entirety.

III. The Navy's Estimated Level of Effort is Not a Guaranteed Minimum

The estimated level of effort for each performance period set forth in Section B-3(d) of the FSET-I task order is an estimate, not a guaranteed minimum (finding 26).

12

The solicitation was explicit on this point, stating that "actual contract performance may vary from this estimate" and that the "government cannot guarantee the contractor will perform the estimated hours shown for either the individual labor categories or the total estimated hours" (finding 17). This also is consistent with the task order's performance work statement, which explains that the Navy's actual requirements under the task order will be determined and filled on an "emergent" basis and as requested by various authorized government personnel (finding 18).

Estimates are not guarantees. "Estimated contract requirements do not represent a guarantee or warranty and, normally, significant variances between estimated requirements and actual orders will not result in liability on the part of the government." *Vectrus Sys. Corp.*, ASBCA No. 63444, 25-1 BCA ¶ 38,802 at 188,726 (citing *Hi-Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420 at 428-29 (2002), *aff'd*, 356 F.3d 1372 (Fed. Cir. 2004)). Moreover, there is no evidence that the Navy duped the contractor into unfairly low bid prices. *See, e.g., Rumsfeld* v. *Applied Cos.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003) (addressing whether the government's incorrect estimates duped the contractor into unfairly low bid prices); noting "[w]here a contractor can show by preponderant evidence that estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]' the government could be liable for appropriate damages resulting." (*Quoting Clearwater Forest Indus., Inc. v. United States*, 227 Ct. Cl. 386, 650 F.2d 233, 240 (1981); *Am. Gen. Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,635.

In practice, the Navy collected information on potential jobs from SPAWAR and other eligible groups and then approached Peraton for a "rough order of magnitude" for the job. Once the customer reviewed the price and timeframe estimates, the Navy would add approved jobs to Peraton's workload (finding 27). This provided the Navy with the necessary flexibility in ordering work under the task order (gov't resp. br. at 12). As Mr. Paul Guerra, the Navy's Assistant Program Manager testified, the Navy built its estimate of labor hours per performance period based on a number of factors, including planned deployments of Naval strike groups and the Navy's historical needs. He explained that the estimate was intended to be a ceiling or maximum number of hours per performance period (finding 24).

In short, the solicitation clearly stated that the level of effort was an estimate, not a guarantee, eliminating any basis for Peraton to claim entitlement to a minimum level of work.

IV.    The Lump Sum Fixed Fee is a Maximum, Not a Guarantee

By the same token, the fixed fee amount represents the maximum fee that Peraton could earn if the Navy used all of its estimated hours. Because the contract

expressly stated that the fee would be paid on a per hour basis – the rate determined by dividing the total lump sum fee by the estimated hours – Peraton was aware that it would receive the full lump sum only if the Navy used all of its estimated hours.

This payment mechanism ensured that Peraton would receive a profit on each hour worked. It also conveniently provided a way to reduce the total fee proportional to the actual hours worked, consistent with SEA 5252.216-9122(g), which requires the CO either to reduce the fixed fee proportionally to the unused level of effort (LOE) or extend the contract term until the full LOE is used (finding 10).

Peraton certainly understood the ramifications of the contract's payment mechanism. When it became clear that the Navy's needs were significantly less than estimated, Peraton realized that it would not receive the total lump sum fee for the contract. Beginning in 2017, without informing the Navy, it attempted to make up for this fact by preparing its rough order of magnitude estimates using a higher hourly rate for profit than set forth in the contract (finding 29). By seeking to charge a higher hourly rate for profit than set forth in the contract, Peraton improperly attempted to make up some of the difference between its total lump sum fixed fee and the lesser amount it would receive based upon the contract's payment formula (*id.*).

Finally, FAR 16.306(d)(2) explains that in a cost-plus fixed-fee term form contract, the fixed fee is only fully recoverable if the contractor states "that the level of effort specified in the contract has been expended in performing the contract work." 48 C.F.R. § 16.306(d)(2). Thus, the contractor cannot recover the total fixed fee unless it has completely performed the level of effort stated in the contract.

Therefore, Peraton's argument that it is entitled to the full lump sum fee, despite not performing the estimated level of effort, directly contradicts the express terms of the contract and applicable regulations.

V.  Whether Navy Has an Obligation to Revise its Estimated Hours if Actual Needs Fall Short

Peraton next argues that the negligent-estimate breach theory, supported by the Interior Board of Contract Appeals' decision in *Sanford Cohen & Assocs.*, IBCA No. 4239, 04-2 BCA ¶ 32,738, applies here because the Navy's grossly overstated estimates denied Peraton its expected profit. Peraton maintains that when the government grossly overestimates its needs, the basis of the contract pricing is undermined at the contractor's expense. (App. br. at 15) According to Peraton, it is entitled to a renegotiation of the fees it received on the basis of what it would have earned had the Navy's estimates more accurately reflected the known level of effort (*id.* at 15-16).

14

The Navy argues that the negligent-estimate breach theory is not applicable to cost reimbursement contracts, particularly when the contractor is not in a loss position. Instead, this theory is intended to address unrecovered costs in fixed-price contracts due to faulty estimates. The Navy challenges Peraton's reliance on *Sanford Cohen*, contending that the case is an outlier and has not been relied upon for a similar decision. (Gov't br. at 13-14; gov't resp. br. at 7-8)

We agree with the Navy. The Federal Circuit has applied the negligent-estimate breach theory only in situations involving fixed-price requirements contracts. *See Agility Def. & Gov't Servs. v. United States*, 847 F.3d 1345, 1350-51 (Fed. Cir. 2017) (applying the negligent-estimate breach theory to a fixed-price requirements contract). The risk of underutilization in a fixed-price contract falls squarely on the contractor, justifying the need for an equitable adjustment when the government's estimates are significantly off. *See Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992) ("the risks associated with variance between actual purchases and estimated quantities are allocated to the contractor"). This risk dynamic does not exist in a cost-plus contract, which reimburses the contractor's costs incurred plus a fixed fee. *See* FAR 16.306(a).

Our precedent has applied the negligent estimate breach theory only to requirements contracts, where the government must provide realistic estimates of its needs and can be held liable for damages if those estimates are negligently prepared. We have found no ASBCA appeal where this theory has been applied to indefinite-quantity contracts or cost-reimbursement contracts. To the contrary, our precedent holds that the government will not be held liable for a negligent estimate in an indefinite-quantity contract. *ABC Data Entry Sys., Inc.*, ASBCA No. 59865, 16-1 BCA ¶ 36,557 at 178,049; *Crown Laundry & Dry Cleaners, Inc.*, ASBCA No. 39982, 90-3 BCA ¶ 22,993 at 115,481, *aff'd*, 935 F.2d 281 (Fed. Cir. 1991) (table).

Finally, *Sanford Cohen* is not binding authority on the Board and we have found no examples of the Board following its precedent. The Interior Board of Contract Appeals was abolished in 2007, with its functions transferred to the new Civilian Board of Contract Appeals (CBCA). The ASBCA and CBCA operate independently, and decisions from one board are not binding on the other. *Nauset Constr. Corp.*, ASBCA No. 61673, *et al.*, 22-1 BCA ¶38,052 at 184,769. Each board has its own jurisdiction and authority to decide contract disputes within its purview, and their decisions are subject to review only by the appropriate appellate courts. *See* 28 U.S.C. § 1295. The ASBCA operates under the Contract Disputes Act (CDA) and its own charter, which mandates that it decides matters independently. CDA, 41 U.S.C. § 7105.

Consequently, Peraton's reliance on the negligent-estimate breach theory, which is inapplicable to cost-plus contracts and unsupported by binding precedent, provides no basis for relief.

VI.    Whether Peraton's Claim With Respect to the First Performance Period is Timely

Lastly, the government contends that Peraton's claim with respect to the base period of the contract is untimely, because it was submitted more than six years following the end of the performance period (gov't resp. br. at 15). Pursuant to the Contract Disputes Act, a contractor must submit its claim within six years of the accrual of that claim. 41 U.S.C. § 7103(a)(4)(A). Here, Peraton's claim states that the first period of performance under the FSET I task order ended on September 15, 2014 (finding 33). Peraton submitted its claim on September 30, 2020, more than six years later (*id.*).

Peraton disputes the government's argument, contending that its claim did not accrue until final closeout of the FSET I task order's final period of performance, reasoning that the Navy had the opportunity to adjust the level of effort in subsequent performance periods (app. reply br. at 11). It relies on 48 C.F.R. § 33.201, which defines "accrual of claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." 48 C.F.R. § 33.201.

Based upon our ruling denying the merits of Peraton's claim, we have no need to reach the further question of whether Peraton's claim with respect to the base period the contract is untimely.

CONCLUSION

The appeal is denied.

Dated: July 10, 2025

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur                                    I concur


_____                     _____
OWEN C. WILSON                              MICHAEL N. O'CONNELL
Administrative Judge                        Administrative Judge
Acting Chairman                             Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                         of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62853, Appeal of Peraton, Inc., rendered in conformance with the Board's Charter.

Dated:


_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals